UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

PANCOAST TRADING, S.A.                    :

               Plaintiff,            :

    - against -                                :

REJOY SHIPPING CO., LTD.              :

              Defendant.            :
-----------------------------------------------------X

08 CV *1881*
ECF CASE

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut )
                )    ss: SOUTHPORT
County of Fairfield )

Claurisse Campanale Orozco, being duly sworn, deposes and says:

1.    I am a member of the Bar of this Court and represent the Plaintiff herein. I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### THE DEFENDANT IS NOT WITHIN THIS DISTRICT

2.    I have attempted to locate the Defendant, REJOY SHIPPING CO., LTD., within this District. As part of my investigation to locate the Defendant within this District, I checked the telephone company information directory for all area codes within the District, as well as the white and yellow pages for New York listed on the Internet or World Wide Web.

3.    I found one company named Rejoy Shipping Co. Ltd., when I checked the New York State Department of State website and conducted a corporate information search. This entity is registered with the New York State Department of State as a New York Domestic

—1—

Corporation. This company was first registered as a New York Domestic Corporation on October 13, 2006. See New York State Department of State Certificate of Incorporation and Status Report attached as Exhibit 1.

    4.    The company that the Plaintiff is suing herein is a company named Rejoy Shipping Co. Ltd.: a Maltese corporation that is registered in the country of Malta and as such, is a resident of Malta. See Contents and Form of Annual Return dated Dec. 6, 2007 for Rejoy Shipping Co. Ltd. of Malta, attached as Exhibit 2.

    5.    Rejoy Shipping Co. Ltd. of Malta was first registered with the Malta Financial Services Authority ("MFSA") in 2000. See MFSA Registry of Companies List attached as Exhibit 3, and the company's Certificate of Incorporation, attached as Exhibit 4.

    5.    The company "Rejoy Shipping Co. Ltd." registered with the NYS Department of State is a NY Domestic Corporation that was registered as such after Rejoy Shipping Co. Ltd in Malta was formed. It cannot therefore be the same company as Rejoy Shipping Co. Ltd. registered in Malta, otherwise it would have to be registered as a New York Foreign Corporation authorized to do business within the State.

    6.    The Plaintiff entered into a charter party is with Rejoy Shipping Co. Ltd. of Malta, and not with Rejoy Shipping Co. Ltd. of New York. See Charter Party between Pancoast Trading S.A. and Rejoy Shipping Co. Ltd. of Malta, at pg. 1, attached hereto as Exhibit 5.

    7.    Had Rejoy Shipping Co. Ltd. of Malta intended to do business in New York, it would be registered as a foreign corporation registered or authorized to do business in the state of New York. Rejoy Shipping Co. Ltd. in New York is not –so registered. Therefore, I do not believe that these two entities described above are one in the same or otherwise related to each other.

8.    There is no other information that I have found that indicates that Rejoy Shipping Co. Ltd. in New York is an alter ego or a/k/a of Rejoy Shipping Co. Ltd. in Malta that would render Rejoy Shipping Co. Ltd. in Malta present within this District.

9.    I submit, therefore, that the Defendant Rejoy Shipping Co. Ltd. in Malta, cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

10.    Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within the District subject to the jurisdiction of this Court.

PRAYER FOR RELIEF FOR AN ORDER ALLOWING SPECIAL PROCESS SERVER

11.    Plaintiff seeks an Order, pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, appointing Thomas L. Tisdale, Claurisse Campanale-Orozco, Lauren C. Davies, or any other partner, associate, paralegal or agent of Tisdale Law Offices, to serve the Verified Complaint, Process of Maritime Attachment and Garnishment, Interrogatories or other process in this action, including any amended pleadings filed herein, upon the garnishee(s) who, based upon information and belief may hold assets of, for or on account of the Defendant.

12.    Plaintiff seeks this Order to serve the Process of Maritime Attachment and Garnishment will deliberate speed in order to fully protect itself against the potential of being unable to satisfy any judgment or award obtained by Plaintiff against Defendant.

13.    To the extent that Plaintiff's Application for an Order appointing a special process server does not involve the restraint of physical property, service does not need to be effected by the Marshal's Office. Service sought to be carried out by Plaintiff is the delivery of the Process of Maritime Attachment and Garnishment to the various garnishees identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

14.    Plaintiff further requests that this Court grant it leave to serve any additional garnishee(s) who may, upon information and belief, obtained in the course of this litigation, to be holding or believed to be holding, property of the Defendants, within this District. Obtaining leave of Court at this time to serve any later identified garnishee(s) will allow for prompt service of the Writ of Maritime Attachment and Garnishment without the need to present to the Court amended Process to add future identified garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

15.    Plaintiff also respectfully requests that the Court grant it leave, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, to authorize service of process via facsimile or e-mail following initial in personam service.

16.    This is Plaintiff's first request for this relief made to any Court.

Dated: February 26, 2008
      Southport, CT

Clarisse Campanale-Orozco

Sworn and subscribed to before me
this ___ day of Feb. 2008.

Notary Public

—4—

# EXHIBIT 1

*1821*

(V⁻161010000 *393*

New York State
Department of State
Division of Corporations, State Records
and Uniform Commercial Code
Albany, NY 12231
www.dos.state.ny.us

## (This form must be printed or typed in black ink)

# CERTIFICATE OF INCORPORATION

Rejoy Shipping Co., Ltd.
**OF**
_(Insert corporate name)_

### Under Section 402 of the Business Corporation Law

**FIRST:** The name of the corporation is: Rejoy Shipping Co., Ltd.

**SECOND:** This corporation is formed to engage in any lawful act or activity for which a corporation may be organized under the Business Corporation Law, provided that it is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body without such consent or approval first being obtained.

**THIRD:** The county, within this state, in which the office of the corporation is to be located is: Westchester

**FOURTH:** The total number of shares which the corporation shall have authority to issue and a statement of the par value of each share or a statement that the shares are without par value are: 200 No Par Value

**FIFTH:** The Secretary of State is designated as agent of the corporation upon whom process against the corporation may be served. The address to which the Secretary of State shall mail a copy of any process accepted on behalf of the corporation is:

Stuart E. Leyton
Rejoy Shipping Co., Ltd.
1333A North Avenue, #517, Wykagyl, NY 10804

DOS-1239 (Rev. 6/06)

-1-

(061010000 393

2006 OCT 10 PM12: 33

## Incorporator Information Required

x _[signature]_
*(Signature)*

Stuart E. Leyton
*(Type or print name)*

P.O. Box 20628 Park West Fin. Sta. ⟩ Mailing
*(Address)*

New York, NY 10025-1515
*(City, State, Zip code)*

1333 A North Avenue, #517, Wykagyl, NY 1080~ ⟩ Legal

## CERTIFICATE OF INCORPORATION
## OF

Rejoy Shipping Co., Ltd.
*(Insert corporate name)*

Under Section 402 of the Business Corporation Law

3 CC 2GS

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED   OCT 1 0 2006/d
TAX $ _____
BY: _____ Westchester

Filed by:   Stuart E. Leyton
*(Name)*

P.O. Box 20628 Park West Finance Station
*(Mailing address)*

New York, N.Y. 10025-1515
*(City, State and Zip code)*

Note: This form was prepared by the New York State Department of State for filing a certificate of incorporation for a business corporation. It does not contain all optional provisions under the law. You are not required to use this form. You may draft your own form or use forms available at legal stationery stores. The Department of State recommends that legal documents be prepared under the guidance of an attorney. The fee for a certificate of incorporation is $125 plus the applicable tax on shares required by Section 180 of the Tax Law. The minimum tax on shares is $10. The tax on 200 no par value shares is $10 (total $135). Checks should be made payable to the Department of State for the total amount of the filing fee and tax.

-2-

2006 OCT 10 AM 11:05

RECEIVED

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: REJOY SHIPPING CO., LTD.

Selected Entity Status Information

| | |
|---:|:---|
| **Current Entity Name:** | REJOY SHIPPING CO., LTD. |
| **Initial DOS Filing Date:** | OCTOBER 10, 2006 |
| **County:** | WESTCHESTER |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
STUART E. LEYTON
REJOY SHIPPING CO., LTD.
1333A NORTH AVENUE, #517
WYKAGYL, NEW YORK, 10804

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# EXHIBIT 2

MERCHANT SHIPPING (Shipping Organisations – Private Companies) REGULATIONS, 2004

**REGISTRY**

06 DEC 2007

**OF COMPANIES**

ᄔᄔᄆ   Aᄔ876

Company No: C27364

**FIFTH SCHEDULE**

**(Regulation 80)**

C 27364/ 7

10 DEC 2007

# CONTENTS AND FORM OF ANNUAL RETURN

ANNUAL RETURN of     **Rejoy Shipping Co. Ltd**

.............................................................................................................

...........................................................................(name of company)

Date to which this return is made up:  **29th November, 2007.**

*(being the anniversary of the company's date of registration)*

## 1. Address

*(Address of the registered office of the company)*

**Exchange Buildings, Republic Street, Valletta, Malta.**

## 2. Summary of Share Capital and Debentures

All Maltese liri amounts are to be preceded by the symbol Lm. Symbols used for other currencies are to be indicated (where applicable).

| Currency | Symbol |
|---|---|
| **Maltese Lira** | **Lm1** |
| ........................................... | ........................................... |
| ........................................... | ........................................... |
| ........................................... | ........................................... |

**(a)    *Nominal Share Capital***

Nominal Share Capital      **Lm500**      divided into:

(insert number and class)

| 500 | Ordinary | shares of | **Lm1** | each |
|---|---|---|---|---|
| .................. | .................................. | shares of ................................... each | | |
| .................. | .................................. | shares of ................................... each | | |
| .................. | .................................. | shares of ................................... each | | |

**(b)    *Issued Share Capital***

| | Number | Class | |
|---|---|---|---|
| Number of shares of each class taken up to the date of this return (which number must agree with the total shown on the list as held by existing members). | **500** | **Ordinary** | shares |
| | .................. | .................. | shares |
| | .................. | .................. | shares |
| | .................. | .................. | shares |

Number of shares of each class issued as partly paid up and extent to which each such share is so paid up.

issued as paid up to the extent of **20c**

per share on   **500**   **Ordinary**                        shares

issued as paid up to the extent of ..........

per share ............   ..................                      shares

issued as paid up to the extent of ..........

per share ............   ..................                      shares

issued as paid up to the extent of ..........

per share ............   ..................                      shares

| | Number | Class | |
|---|---|---|---|
| Total number of shares of each class forfeited. | .................... | .................. | shares |
| | .................... | .................. | shares |

Total amount paid, if any, on shares

forfeited. .... .... .... ....                        ...........................

## 3. List of Past and Present Members

List of persons holding shares or stock in the company on the date to which this return is made up, and of persons who have held shares or stock therein at any time since the date of the last return, or in the case of the first return, of the registration of the company.

| Folio in register ledger containing particulars | Names Addresses (in the case of a body corporate, its registered office) | Number of shares held by existing members at date of return *# | Account of Shares | | Remarks |
|---|---|---|---|---|---|
| | | | Particulars of shares transferred or transmitted *causa mortis* since the date of the last return, or, in the case of the first return, of the registration of the company by (a) persons who are still members and (b) persons who have ceased to be members ** | | |
| | | | Number # | Date of registration of transfer | |
| | | | (a) | (b) | |
| 2 | Freeport Navigation Inc. | 250 | | | |
| | 80, Broad Street, Monrovia, Liberia. | | | | |
| 1 | Nikolaos Kekridis | 250 | | | |
| | 83, G. Lyra Street, 14565 Kifissia, Greece. | | | | |
| | | | | | |

## 4. Particulars of Directors

Particulars of the persons who are directors of the company at the date of this return.

| Name (in the case of an individual, name or names and surname. In the case of a body corporate, the corporate name) | Nationality | Usual residential address (in the case of a body corporate, its registered office). |
|---|---|---|
| Dimitrios Tsitsas | Greek | 83, G. Lyra Street, 14565 Kifissia, Greece. |
| Nikolaos Kekridis | Greek | 83, G. Lyra Street, 14565 Kifissia, Greece. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Signed ............................................................
Director/ Secretary/ Representative

# EXHIBIT 3

Registry of Companies Publications

# MFSA
MALTA FINANCIAL SERVICES AUTHORITY

*Registry of Companies*

*Home*

>> Search by Registration Date / Registration Number
>> Archive

| Search Results: | | | |
|---|---|---|---|
| **Search Criteria:** <br> - Registration Number like "27364" | | | |
| **Registration Number** | **Company Name** | **Document Registration Date** | **Publication** |
| C 27364 | REJOY SHIPPING CO. LTD. | 23/11/2005 | **View Publication** |
| C 27364 | REJOY SHIPPING CO. LTD. | 20/11/2007 | **View Publication** |

http://www.mfsa.com.mt/publications/search.asp?srchtyp=3

2/25/2008

# EXHIBIT 4

C 27364

No. of Company _____

# COMMERCIAL PARTNERSHIPS ORDINANCE

## Certificate of Registration of a Limited Liability Company

### Pursuant to Section 75

**Rejoy Shipping Co. Ltd**

Name of Company _____

**Exchange Buildings, Republic Street, Valletta VLT 05, Malta**

Registered Office _____

**29 November 2000**

Date of commencement of the Company _____

**DR ANTON BARTOLO LL.D.**
*Registrar*

Dated this 29th *day of* November, 2000

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   **This Charter Party**, made and concluded in London ................................................................ 15th day of January .................... 19 2007

2   Between *REJOY SHIPPING CO LTD., VALLETTA, MALTA,* ......................................................................................................

3   Owners of the good *Panamanian Flag* ........................................ Steamship/Motorship *"Spring Breeze I"* (See Clause 69) ...... of .... .............................. ~~indicated horse power~~

4   of 16829 ........................ tons gross register, and 9293 ........................ tons net register, having engines of .......................................................................................

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed *ABS* ................................................................................................

6   at ................................ of about 33,586 ................................ cubic *metres* ~~per bale~~ grain capacity, and about *26710 metric* ................... tons of 2240 lbs.

7   ~~deadweight capacity (cargo and~~ bunkers, including fresh water and stores) ~~not exceeding one~~ ~~and one half~~ ~~percent of ship's deadweight capacity,~~

8   ~~allowing a minimum of fifty tons)~~ on a draft of *10.5 metres* ~~feet~~ ................ ~~inches on~~ ................................ Summer freeboard, inclusive of permanent bunkers,

9   ~~which are of the capacity of about~~ ........................................................................ ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10  conditions *(upto Beaufort Scale Force 4/Douglas Sea State 3) about 13* knots on a consumption of about *26 metric tons fuel 180 CST RME*

11  *25 plus 2.5 mt MGO DMA* ~~of best Welsh coal—best grade fuel oil—best grade Diesel oil.~~

12  now in ballast ................................................................ and *PANCOAST TRADING S.A.* ........................................ Charterers of the City of *Liberia* .........

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *a timecharter period of min 11 to maximum 13 months in Charterers option trading via safe ports, safe berth/s, safe*

15  *anchorage/s always afloat except NAABSA as per NYPE Clause 6, where customary in Argentina, Uruguay, South Brazil and*

16  *Buenaventura, in or out of geographical rotation* within below mentioned trading limits.

17  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for the fulfillment of this Charter Party. Acceptance of delivery of vessel does not constitute any waiver of any of Owners obligations under this Charter Party.

18  Vessel to be placed at the disposal of the Charterers, ~~or~~ retroactively sailing *Luanda 8th January 1745 hours local time*

19  ~~in such dock or at such wharf or place~~ (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 9), at

20  ~~the Charterers may direct. If such dock or place be not available time to count as provided for in clause No. 5.~~ Vessel on her *arrival first load port*

21  delivery to be

22  ready to receive *any permissible* cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the *ordinary cargo service*, having water ballast, winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the cranes/winches at one and the same

24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25  dise, ~~including petroleum or its products, in proper containers, excluding See Clause 65~~ ................................................................

26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~ ~~and/or Europe,~~

29  ~~Mexico, and/or South America,~~

30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports—also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

32  ................................................................................................................................................................................

33  ................................................................................................................................................................................

34  ................................................................................................................................................................................

35  as the Charterers or their Agents shall direct, on the following conditions:

36  1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the *non-compulsory garbage removal and non-compulsory watchmen for ship,*

37  insurance of the vessel; also for all the cabin, deck, engine-room and other necessary stores, including boiler water *and luboil* and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39  2.   That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and/or customary* Pilotages, *including Bosporus, Great Belt, Japan inland sea, Orinoco and Amazon Sea Buoy pilotages, canal tolls and fees tugs,* Agencies, Commissions.

40  Consular Charges (except those pertaining *individual crew members or the flag of the vessel* ~~to the Crew~~), and all other usual expenses except those before stated, but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44  ~~of six months or more.~~ *See Clause 84.*

45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48  3.   ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49  board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than .................... tons and not more than

50  .................... tons and to be re-delivered with not less than .................... tons and not more than .................... tons. See Clause 41.

51  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$16850 *per day pro rata including over time*

52  .................... United States Currency *per ton on vessel's total deadweight carrying capacity, including bunkers and*

53  *stores, on* .................... *summer freeboard, per Calendar Month*, commencing on and from the day *time* of her delivery, as aforesaid, and at

54  and after the same rate for any part of a day *month*, to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) on *on dropping last outward sea pilot safe port or passing safe port within the following*

56  *ranges, port in Charterers option, any time day or night, Sundays and Holidays included a) Baltic - Continent, Mediterranean*

   *range including UK/Eire, full Mediterranean and Black Sea and Morocco, Charterers option b) Boston-Buenos Aires range*

   *including NCSA and Caribbean, Charterers option c) Manzanillo, WC Mexico - San Antonio, Chile, range Charterers option d)*

   *Dakar-Mombasa range* unless otherwise mutually agreed. Charterers are to give Owners not less than *20/15/10 days preliminary days*

57  notice of vessels expected date of re-delivery, and probable port *and thereafter 5/3/2/1 days final notice of the port of redelivery* .

58  5.  Payment of said hire to be made in *(See Clause 72)* New York in cash in United States Currency, *15 days* semi-monthly in advance, and for the

   last half month or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may have on the Charterers. Time to count from 7 a.m. on the working day

63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they

64  to have the privilege of using vessel at once, such time used to count as hire.

65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the *Owners Captain* by the Charterers or their Agents, subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68  6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

70  lie aground.

71  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for the Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow. Charterers

74  paying Owners .................... per day per passenger for accommodations and meals. However, it is agreed that in case any lines or extra expense are

75  incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76  8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the *hire*. The Charterers as regards employment and

78  agency, and Charterers are to load, stow, and trim *tally/lash/unlash/dunnage/weigh and discharge* the cargo at their expense under the supervision of

   the Captain, who is to sign *clean* Bills of Lading for

79  cargo as presented, in *strict* conformity with Mate's or Tally Clerk's receipts, *Master to immediately reject any damaged cargo that would have*

   *meant the clausing of Mate's receipts and/or Bills of Lading. (See Clause 68)*

80  9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany *at their risk and expense and after having faxed*

   *signed L.O.I. as per Charterers' P and I Club wording to Owners* the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying *(See Clause 59)* at the current rate per meal, for all such victualling.

86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agent, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *log abstracts for the duration of the Charter Party* showing the

89  course of the vessel and distance run and the con-

   sumption of fuel *and now of main engine and wind/sea conditions in English.*

90  12.  That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation only.*

91  13.  That the Charterers shall have the option of continuing this charter for a further period of ....................

92  .................... ....................

93  on giving written notice thereof to the Owners or their Agents .................... days previous to the expiration of the first named term, or any declared option.

94  14.  That if required by Charterers, time not to commence before .................... .................... and should vessel

95  not have given written notice of readiness on or before .................... but not later than 4 p.m. Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of Vessel's readiness.

97  15.  That in the event of the loss of time from deficiency of *Owners* men or stores, fire, breakdown or damages to hull, machinery or equipment, *unless*

   *caused by Charterers, and/or their agents and/or their servants,*

98  grounding, detention by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect of the cargo,* drydocking for the

   purpose of examination or painting bottom, or by any other cause

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra *directly related* fuel consumed in

   consequence

101  thereof, and all extra *substantiated/directly related* expenses shall be deducted from the hire.

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106    purpose of saving life and property.

107    17.    That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons in *London according to*
*English Law and under the jurisdiction of the High Court of England* at New York,
108    one to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or that of any two of them, shall be final, and for
109    the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *members of the London Maritime*
*Arbitrators' Association* commercial men.

110    18.    That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due under this Charter, including General
111    Aver-age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112    deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113    might have priority over the title and interest of the owners in the vessel.

114    19.    That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115    Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116    York-Antwerp Rules *1994 in London and subsequent amendments according to English Law* 1924, at such port or place in the United States
117    as may be selected by the carrier, and as to matters not provided for by these
Rules, according to the laws and usage at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118    United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119    the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120    bond and each additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121    or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122    required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123    carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account in the
124    name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
United States money.

125    In the event of accident, danger, damage, or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,
126    whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
127    goods, the shipper, and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
128    losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
129    goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or
130    ships belonged to strangers. *Hire not to contribute to General Average.*
131    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

132    20.    Fuel used by the vessel while off hire, *to be for Owners' account* also for cooking, condensing water as for grates and stoves to be allowed free of
133    quantity, and the
cost of replacing same, to be allowed by Owners.

134    21.    That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
135    convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
136    time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

137
138
139    22.    Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons also
140    providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
141    same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *adequate lights for all*
142    *hatches/holds for lanterns and oil for*
143    night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144    Charterers to have the use of any gear on board the vessel.

145    23.    Vessel to work night and day, if required by Charterers, *shore winchmen to be employed/paid by Charterers* and all winches to be at
146    Charterers' disposal during loading and discharging. Charterers agreeing to pay officers, engineers, winchmen,
147    steamer to provide one winchman per hatch to work winches day and night as required. Charterers agreeing to pay officers, engineers, winchmen,
148    deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the rules of the
port or labor unions; provided crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149    insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150    thereby.

151    24.    It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153    etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154    of which are to be included in all bills of lading issued hereunder:

155    **U.S.A. Clause Paramount**
156    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157    16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this bill of lading
159    be repugnant to said Act to any extent, such terms shall be void to that extent, but no further.

160    **Both-to-Blame Collision Clause**
161    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163    hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165    carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166    owners as part of their claim against the carrying ship or carrier.

167    25.    The vessel shall not be required to enter any ice-bound port *nor to force ice neither to follow icebreakers*, or any port where lights or
light-ships have been or are about to be with-
168    drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169    port or to get out after having completed loading or discharging.

170    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171    navigation of the vessel, *acts of pilots, tugboats and linesmen* insurance, crew, and all other matters, unless when trading for their own account.

172    27. A commission of *1.25%* per cent is payable by the Vessel and Owners to
173    *Century Chartering (UK) Ltd and 1.25 % to Doric Shipbrokers S.A.* ..................................................................................
174    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28. An address commission of 2 1/2 per cent *is* payable to *Charterers Pancoast Trading S.A.* on the hire earned and paid under this Charter.

*Clauses No 29 to 93 both inclusive as attached hereto, are incorporated within the terms of this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 29 Breakdown/Loss of time-off hire
In the event of any loss of time due to, but not limited to:

- Deficiency of Officers/crew/men or stores
- Breakdown or damage to hull, machinery or equipment
- Detention by average accidents to ship/cargo except cargo with latent defects, the particular quality of inherent vice of the cargo including collisions/stranding
- Repairs/dry-docking or other necessary measure to maintain the efficiency of the vessel
- Failure to possess such valid certificates or other documentation for the vessel/Officers/crew
- Breakdown of non-conformity or disablement of one or any/all equipment necessary for loading/discharging cargo or preventing full operation of vessel.

Then vessel to be off-hire for any/all time hereby lost and Owners to pay all directly related expenses incurred, including but not limited to stevedore standby time, if any but maximum one shift. However Charterers to do their utmost to limit such expenses, if any.

Clause 30
The vessel to hold and keep valid deratisation or deratisation exemption certificates throughout the Charter period. Cost and time of deratisation, if necessary, to be for Owners' account, however if because of cargo or vessel having been sent to an infected port or port where fumigation is ordered whilst on charter by Charterers, cost and time to be for Charterers' account.

Clause 31 – Safe Ballast
Owners guarantee vessel always to be safe in ballast and it is agreed that if any solid ballast is required, all expenses for same including time used in loading and discharging to be for Owners' account.

Clause 32 – Ballasting/De-ballasting
Vessel to ballast/de-ballast clean water ballast tanks, if required by Charterers or their agents, at any time during loading and/or discharging, free of expense to Charterers, but in Charterers time. All ballasting/de-ballasting shall be at the discretion of Master having regard stability and seaworthiness of the vessel.

Clause 33 – Confidential Fixture
Both Owners and Charterers will officially keep negotiations and fixture private and confidential.

Clause 34
Charterers shall have the right to carry out a hose test on vessel's hatch covers prior to or during loading.
Any deficiencies in the vessel's hatch covers which are discovered during such hose testing to be rectified immediately at Owners time and expense with the vessel remaining off-hire for all time actually lost thereby.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 35 – Black list
Owners confirm that vessel has not traded in CIS Pacific in the last twelve months.

Clause 36 – Stowage
The Master shall supervise stowage of the cargo as well as instruct one of his officers
to supervise all, loading, handling and discharge of the cargo and he is to furnish
Charterers with stowage plans as well as tally slips and other documents customarily
used.

Clause 37 – Grain
Owners warrant that the vessel is suitable for carrying a full cargo of grain in all holds
without requiring any grain fittings and/or bagging or securing etc. –

Vessel has on board valid grain loading booklet in accordance with SOLAS 1974
regulations and INCO resolutions A-264 (VIII) as adapted in 1974. Furthermore,
vessel to have on board approved table of heeling movements for "filled holds-
untrimmed ends in accordance with IMCO BC-xix/inf.4. It is understood that grain
loading to be according to IMO regulations and per vessel's grain loading booklet. –

Clause 38 – Holds on Delivery/Redelivery
On arrival first loadport holds to be clean/swept/washed/dried and free of all/any
loose rust scale/cargo residues/infestations and odour suitable in every respect to load
any permissible cargo. Holds to be about same condition redelivery, alternatively
Charterers paying USD3000 lump sum in lieu of hold cleaning on redelivery,
excluding dunnage/lashing debris removal and disposal.

Charterers to ensure that dunnage, if any is supplied to vessel during this charter, shall
be properly treated, marked and certified in order to comply with U.S.A. and/or other
relevant countries health/quarantine and other applicable regulations.

Intermediate Hold Cleaning
Intermediate hold clean USD 450 per hold cleaned on completion of discharge each
cargo hold during this charter, vessels crew shall render customary assistance in
cleaning holds in preparation for next cargo if required by Charterers and if not
prevented by shore regulations. Such cleaning to be performed immediately upon
completion of discharge and/or while vessel is on route to next loading port provided
that this can be safely done, weather permitting, and that the duration of the voyage is
sufficient.
Crew to carry out such work as if it was for Owners account. If compulsory shore
labour is required for hold cleaning then same to be for Charterers account.
The Owners shall not be responsible if the vessels holds are not accepted or passed for
the next cargo and all time lost or expenses incurred as a result of any failure shall be
for Charterers account.
Any special equipment and/or materials/chemicals etc which may be required for hold
cleaning, including additional fresh water not already on board for hold fresh water
washing, are always to be provided and paid for by Charterers.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 39 – Delivery/redelivery Survey
A joint on and off-hire survey to be held at first loading port In Owners' time. A joint off-hire survey to be held at redelivery port in Charterers' time. Each party to appoint and pay for his own surveyor. Owners/vessel may be represented by the Master/Chief Engineer.

Clause 40 – Notices for Delivery
The Owners to give the Charterers notice on fixing and then not less than 4/2/1 days notice of the date on which the vessel is expected to be ready for delivery. The Owners to keep the Charterers closely advised of possible changes in vessels position.

Notices to be sent Pancoast Trading S.A.
5 Lagadion Street, 151 25 Maroussi, Greece
Tel: (30210) 8171090 / 6813668
Fax: (30210) 6816433 / 6815777
Tlx: 214535 KRSN GR
EMAIL: info@pancoast-trading.com

Clause 41 – Bunkering
Bunkers on delivery expected to be about 522.8 metric tons IFO and about 102.6 metric tons MDO payable along with first hire. Vessel to be redelivered with about the same quantities as were actually on board on delivery. Same prices both ends, US$300 pmt for IFO and US$600 pmt for MDO. Any minor differences to be settled with final hire payment at above prices. Charterers to take over bunkers on delivery and pay values of bunkers on delivery together with first hire to Owners bank account. Owners to have the right to bunker the vessel for their own account prior to redelivery provided same does not interfere with Charterers operations. In case value of estimated bunkers on redelivery exceed the value of the last 15 day hire, then its Charterers option to deduct value of bunkers from last sufficient hire payments.

Clause 42 – Protective Clauses
General Clause Paramount, New Jason Clause, New Both to Blame Collision Clause, "Conwartime 2004" are all deemed incorporated in this Charter Party. New Jason Clause, New Both to Blame Collision Clause and General Paramount Clause, USA Clause Paramount, Voywar 2004 to be incorporated if all Bills of Lading issued under this Charter Party where applicable.

Clause 43 – Errors
To offset errors, Owners or Charterers to give each other at least 48 hours substantiated written notice before exercising their rights under this Charter Party, in the event of a default in the payment of hire, Owners are to telex Charterers of the default. Owners are not to withdraw the vessel if Charterers make good the default within 2 banking working days, or provided a guarantee acceptable to Owners to secure the alleged under/non-payment within such period.

Clause 44 – D e l e t e d

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 45 – Grabs

Charterers to have the liberty to use grabs for discharge in all cargo holds subject to arrange such grabs at Charterers' time and expense. Vessel's holds/hatches to be clear and free from all obstructions and suitable in every respect for grab discharge. All/any pipes/wires/cables to be covered and protected and Owners to be responsible for any/all damage if incurred due to vessel's non-compliance with this Clause.

Clause 46 – Hatches

Opening and closing of hatches, wherever required to be performed by vessel's crew, provided local authorities permit it. In addition crew to tender any normally required assistance.

Clause 47 – Hatch Covers

Vessel's Hatch covers are and are to remain during the currency of this Charter Party in proper condition, totally watertight.

In the event of waterside workers or others at any time refusing to handle the vessel due to proven inadequacy of hatch covers then crew to handle same provided local regulations permit, otherwise any time lost and/or directly related expenses incurred to be for Owners account.

Clause 48 – Dunnage/Shifting Boards/Cargo Batten

Vessel has no cargo battens. Shifting boards and other dunnage material on board to be stowed out of the way of cargo spaces to Charterers' satisfaction prior to their accepting delivery of the vessel. If nevertheless some of the above mentioned material should be left in vessel's cargo spaces, Owners/Master to remove same during loading on first request of Charterers or their Agents, otherwise Owners to be responsible for delays and extra expenses incurred. The Charterers to have full use of dunnage material on board, natural ventilators, mats etc. Dunnage material delivered on board by Charterers to be removed and disposed by them prior redelivery.

Clause 49 – Insurance

Notwithstanding anything in this Charter Party to the contrary, it is expressly agreed that the Owners remain responsible for all personal injury in accordance with rules of their P & I Club to the extent of a full Shipowner's P & I cover and the Owners guarantee to maintain such P & I cover for the duration of this Charter Party unless such claims are as a result of actions of Charterers/Agents/Charterers servants.

Owners P & I Club is: American Steamship Owners Mutual P and I Association Inc.
Hull and Machinery value is USD5 Million.
Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters, as and when received from their Underwriters, by reason of vessel being laid up for periods qualifying for such returns, provided vessel is on hire.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 50 – Boycotts
Charterers are not to knowingly fix the vessel in to any loading or discharging area where restrictions or ban with respect to the vessel's flag, nationality or registry are at the time of fixing currently in force. However, in the event of loss of time, boycott of the vessel or any labour trouble by shore labour, seamens' unions, tugboats, pilots, linesmen, stevedores and local authorities arising by reason of vessel's flag, nationality or registry, her ownership, management or agents, the nationality of any member of her crew and/or the terms and conditions on which crew members are employed, or by reason of the trading of this or any other vessel under the same ownership and/or operation and/or control, payment of hire shall cease for the time hereby lost. Loss of time, damages and expenses, if any, resulting directly from such action to be for Owners' account.

Clause 51 – I.T.F.
Owners warrant that the terms and conditions under which vessels officers and crew are employed are in accordance with P.O.E.A. (Philippine Overseas Employment Administration) for the duration of this Charter Party. Any delays and/or additional expenses resulting from terms and conditions of employment of the crew to be for Owners account and any time lost to be off-hire.off.

Clause 52 – Customs Fines
Owners to be responsible for customs fines and to put up security in case of necessity if Owners' vessel is proven responsible and if so demanded by local authorities for Owners' matter. Any dispute as to ultimate liability arising insofar to be decided according to the terms and conditions of this Charter Party.

Case vessel is stopped by Port authorities or any other Coast Guard Authority and/or hindered by them in any way to operate under the currency of this Charter Party for reasons which Owners/vessel/Master/crew are responsible, vessel to be off-hire for all such time lost and Owners to be responsible for all directly related consequences/expenses that Charterers may suffer resulting from the above.

Clause 53 – Certificates
Vessel to have on board and up-to-date all of the certificates required and necessary for the allowed trade and to comply with all of the regulations of the countries/ports of call under this Charter.

In case vessel/Owners do not comply with the aforementioned then any time lost and any and all expenses/consequences resulted to be fully for Owners' account.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 54 – Bill of Lading
Master and Owners hereby authorise Charterers and/or their agents to sign Bills of
Lading on Master's behalf in accordance with Mates' receipts. No liner/through or
waybill Bills of Lading to be issued under this Charter Party. If Bills of Lading are
unavailable at discharging port, Owners/Master to discharge against presentation of
LOI in Owners P and I Club wording signed by Charterers only with no bank
guarantee or other counter signature whatsoever. Copies of Bills of Lading to be
attached to Letter of Indemnity.

Clause 55 – Deviation
If, during the currency of this Charter Party, vessel puts back whilst on voyage or any
loss of time caused by accident or sickness of crew (including Master) or any person
on board of the vessel (other than supercargo or passengers travelling under
Charterers' auspices) hire shall not be paid for the time so lost and the cost of extra
fuel consumed and other extra expenses incurred shall be for Owners' account until
vessel is in same or equidistant position where deviation took place and voyage
resumed therefrom.

Clause 56 – Sanitary
Officers and crew to comply with vaccination and sanitary regulations in all ports of
call and corresponding certificates to be available on board, otherwise any detention
and fines resulting from not having these certificates on board to be for Owners'
account.

Clause 57 – speed/Consumption
a. Charterers option to supply to a weather routing company to Master during
   voyages specified by Charterers. The Master to comply with the reporting
   procedures of the routing service. The vessel shall be capable at all times during
   the currency of this Charter Party of steaming at about 13 knots laden. For the
   purpose of the Charter Party "good weather condition" are to be defined as
   weather conditions in wind speeds not exceeding Beaufort Force 4/Douglas Sea
   State 3. Evidence of weather conditions to be taken from ship's deck logs and
   independent weather bureau reports. Master remains the ultimate authority with
   regards to ships navigation.
b. Vessel further details as per the attached "Description Clause 69" are fully
   incorporated and form part of this Charter Party.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 58 – Services
Vessel to work night and day if required by Charterers and all winches and/or cranes to be at Charterers' disposal during loading and discharging.  Wire also to include, but not limited to, the following services.

a. Raising and lowering and rigging cranes and/or gangways in preparation for loading and discharging.

b. Opening and closing of hatches in connection with loading and discharging, local regulations permitting.  Otherwise shore labour to be employed at Charterers' time and expense.

c. Closing and opening if hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging, local regulations permitting.

d. Customary supervision of loading and discharging.  Master to remain responsible for the stowage of the vessel insofar as this concerns the trim and/or stability of the vessel.

e. Maintaining sufficient steam/electric power in good order whilst loading and discharging.

f. Shifting vessel during loading and discharging and shifting berth –

g. Docking and undocking

h. Bunkering

i. Weather permitting, officers and crew to shape up vessel's hatches and cranes as much as possible prior to arrival at loading and/or discharging ports or places so as to immediately commence loading and/or discharging operations.

Master is to follow Charterers time charter reporting instructions.

Clause 59 – Cables
The Master is to comply with Charterers' instructions given at the commencement of each voyage.  Charterers to pay Owners lump sum USD1200 per month/pro rata for communication/victualling/gratuities –

Clause 60 – Hire/General Average
Hire not to contribute to General Average.

Clause 61 – War
In the event of outbreak of war between any of the following countries: USA, Commonwealth of Independent States, China, Japan, Australia, United Kingdom and the country of vessel's flag, both parties have the option of cancelling this Charter Party.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 62 – Liability for Cargo Claim
Liability for cargo claims shall be apportioned as specified in the Interclub Produce
Exchange Agreement of 1996 and subsequent amendments. Such claims to be filed in
writing within 12 months of Bills of Lading date, otherwise claims to be rejected
outright. No extension to be granted without the consent of either party.

Clause 63 – Cargo Exclusions
Asphalt, bitumen, borax in bulk, pitch, sponge iron, direct reduced iron ore pellets,
HBI, mahogany or any other logs, arms, ammunition, explosives, corrosives,
sunflowerseed expellers, nuclear substances, acids, livestock, copra, clay, flourspar,
scrap, motorblocks, turnings, blackpowder, charcoal in gunny bags, calcium carbide,
naptha, tar, petroleum derivatives and all its products, salt peter, manioc, calcium
hypochloride, hides, fire briquettes, lime, asbestos, injurious and/or dangerous
cargoes, motor spirit, zinc ashes, blasting caps, detonators, bombs, dynamite and
TNT, radioactive products, combustible or inflammable expellers, creosoted goods,
carbon black.

For any cargoes out of Brazil that subject the vessel to D.P.C. inspection then cost of
same and time required to be on Charterers account.

It is understood Charterers may load.

Max 2 cargoes of bulk cement but not to be the last petroleum coke - but not to be one
of the last two cargoes loaded max 1 cargo of sulphur but not to be the last max 2 salt
cargoes permitted but not to be the last.

When loading salt or sulphur, Charterers to provided and apply appropriate
limewashing at their time and expense to Masters satisfaction. Removal of lime
remnants to remain Charterers ultimate obligation.
If requested by Charterers crew to carry out limewashing providing weather
conditions permit. Charterers to supply the necessary equipment (portable pumps) and
materials (limewash and other required). Charterers to pay owners a bonus of USD
300 per hold limewashed.

Vessel has appendix b cert for ammonium nitrate.

Clause 64 – Agency Appointment
Owners to appoint their own Agents where necessary, to attend to all Owners' matters
such as delivery, redelivery, general average, drydocking, and repair. Charterers
agree to have their appointed Agents attend to routine ship's husbandry with Owners
paying Charterers' Agents actual expenses and an appropriate percentage of the
agency fee according to the Charterers tariff rate.

Where Owners do not settle directly with Charterers' Agents, Charterers to charge
2.5% handling fee for all payments for account Owners.

For Owners minor matters, Charterers agents to attend without extra fees.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 65 – Charter Hire Deductions

Owners to settle expenses with Agents directly through Master. No deductions by
Charterers to take place in this regard. Owners to remain responsible for any
delays/costs caused by their failure to place agents in funds timely for Owner's
expenses.

Charterers undertake to advise Owners within 40 days of completion of a voyage of
any speed and consumption claims. The quantified claim to be submitted to the
Owners within 50 days of completion of the voyage.

Clause 66 – Fines

Any fines imposed on the vessel, Owners, Master, Officers or members of the crew or
Charterers originating from the Master, Officers or crew contravening local port
and/or customs regulations, particularly as regards smuggling, to be for Owners'
account and Charterers are not to be responsible for any consequences resulting from
such offence.

Any time lost due to above circumstances to be for Owners' account and to be
deducted from hire. Conversely, if any, of the aforesaid caused by Charterers servants,
then Charterers to remain responsible for any claims/damages/time loss etc.

Clause 67 – Arrest/Seizure

Should the vessel be arrested and/or seized before or during the currency of this
Charter Party at the suit of any person having or purporting to have a claim against or
any interest in the vessel or by any other default of Owners, hire under this Charter
party shall not be payable in respect of any period whilst the vessel remains
unemployed as the result of such arrest only if such arrest affects loading/discharging
operation and the Owners shall reimburse to the Charterers any expenditure which
they may incur under this Charter Party in respect of any period during which by
virtue of the operation of this Clause, no hire payable, unless such arrest is caused by
actions of Charterers.

Clause 68

For all cargoes loaded other than steels master to reject any damaged cargo that would
mean the clausing of mates receipts but when loading steels following to apply in
regards to Bills of Lading.

I) Clean Bills of Lading

In the event that Charterers load steel or steel products owners option to appoint a
surveyor through their PandI club to carry out a preloading cargo condition survey
and discharging survey. Cost to be solely for owners account. Owners' surveyors to
coordinate closely with the appointed independent surveyors and shippers with
regards to any remarks that maybe required to be inserted on the mates receipts.

Charterers and/or their agents will be authorised to issue Bills of Lading in strict
conformity with mates receipts.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 68. Cont/d...
2) Non clean Bills of Lading
If Charterers do not require clean Bills of Lading, exemptions to be noted on the Bills of Lading individualised per piece/unit of cargo. Remarks to be qualified and quantified, remarks like "all" or "some" or in percentages etc, are not to be inserted. Master to advise intended remarks as the daily figures are presented and supercargo if attending to be kept fully informed prior to remarks being recorded.

3) Independent Surveyor
Owners guarantee Master to allow independent surveyor appointed by Charterers/ shippers/receivers to have free access to the vessel, including holds to carry out cargo survey and to take photographs together with owners/vessels surveyor, of cargo condition if required, either at load port and/or discharge port.
Steel products to be loaded, dunnaged, stowed, lashed, secured to Masters satisfaction and to be loaded and stowed in accordance with vessels tank top strengths and stability.

Owners surveyors to coordinate closely with the appointed independent surveyors and shippers with regards to the remarks to be inserted on the Bills of Lading or relevant documentation, if any, as per paragraph 1+2) above, whichever required by Charterers.

Clause 69 – Vessel's Description
MV Spring Breeze I
Panama Flag Built 1984
26,710 MTDW on 10.50 ms SSW
GRT/NRT 16829/9293
LOA 184.63 ms / Beam 22.83 ms
Grain/Bale 33,586/30,899 cbm
Cubic breakdown
GR 4585/6400/5400/5438/6350/5413
BL 4218/5888/4968/5003/5842/4980
6 HO/HA  McGregor Hatchcovers
Hatch Sizes Nos 1-6 12.8 x 12.8 ms
5 Cranes at 25ts each
About 13 knots on about 26 ts IFO 180 CST RME 25 plus 2.5 mts MGO DMA
Idle 2.5 mts MGO  Gear working 4 mts MGO
VESSEL CONSUMES MDO MANOEUVERING IN RESTRICTED WATERS/CANALS/RIVERS

APPROX FLAT AREA OF TANKTOP
HO 1  188 M2
HO 2  359 M2
HO 3  316 M2
HO 4  316 M2
HO 5  366 M2
HO 6  283 M3

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont/d...
TT DIMENSIONS

|       | FWD  | AFT  | LENGTH |
|-------|------|------|--------|
| HO 1  | 2,4  | 14,9 | 21,7   |
| HO 2  | 14,5 | 15,8 | 23,7   |
| HO 3  | 15,8 |      | 20,0   |
| HO 4  | 15,8 |      | 20,0   |
| HO 5  | 15,8 |      | 23,2   |
| HO 6  | 15,8 | 12,5 | 20,0   |

STRENGTH OF WEATHER DECK: 0.865 mts per m2
STRENGTH OF HATCH COVERS: 2.20 mts per m2
STRENGTH OF TANK TOP: 18.0 mts per m2

ALL DETAILS ABOUT

OWNERS WARRANT:

- VESSEL IS SELFTRIMMING SINGLE DECK BULKCARRIER (AND WAS
  ORIGINALLY CONSTRUCTED AS A BULKCARRIER):
- VESSEL HAS CLEAR UNOBSTRUCTED MAIN HOLDS:
- VESSEL DOES NOT HAVE A CENTERLINE BULKHEAD/BEAM OR ANY
  OTHER OBSTRUCTIONS:
- VESSEL HAS NO DEEP TANKS OR COMPARTMENTS THAT WERE
  ORIGINALLY CONSTRUCTED AS DEEP TANKS:
- VESSELS HAS NO REEFER SPACE OR SPECIAL CARGO LOCKER SPACE:
- CARGO TO BE LOADED IN CLEAR UNOBSTRUCTED MAIN HOLDS ONLY-
  YES
  CARGO NOT TO BE LOADED IN WINGTANKS, DEEPTANKS OR OTHER
  INACCESSIBLE PLACES.
- VESSEL TO BE STEEL FLOORED THROUGHOUT:
- ENGINE/BRIDGE AFT:
- VESSEL TO BE ITF APPROVED - OR EQUIVALENT:

OWNERS WARRANT, THAT DURING THE CURRENCY OF THIS CHARTER
PARTY:
- VESSEL SHALL NOT CHANGE OWNERSHIP OR CLASS WITHOUT
  CHARTERERS' WRITTEN CONSENT:
- VESSEL'S HULL AND MACHINERY INSURANCE SHALL BE FULLY
  MAINTAINED AND WILL NOT BE CHANGED:
- VESSEL IS FULLY PANDI COVERED, WHICH SHALL BE MAINTAINED:
- VESSEL WILL NOT BE SCHEDULED FOR BREAK UP OR SOLD FOR
  SCRAP UPON COMPLETION OF THIS CHARTER:

Following questionnaire is completed only by designated person with knowledge
of the particulars of the vessel under negotiation. Charterers' questionnaire will not be
amended and/or deleted in any way and if there is any information that Owners/
managers are not sure about their accuracy or validity, such will be clearly stated.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont'd...
1. NAME /CALL SIGN: as given / 3eeq5

2. FLAG/PORT OF REGISTRY: as per description

3. BUILT (MONTH / YEAR): 7/84

4. EX NAMES: nand rati

5.
A) PLS ADVISE VSL'S CONTACT NBRS upon fixing

B) IF VSL HAS ONLY TLX ONBOARD OWNERS GUARANTEE THAT IN
COUNTRIES WITH NO TLX
SERVICE (E.G. JORDAN), COMMUNICATION BETWEEN VSL AND SHORE
WILL BE HANDLED BY
OWNERS:

6. CLASSIFICATION: abs

7. OFFICIAL NUMBER AND LLOYDS REGISTER NUMBER:8026139

8. PLS ADVISE FOLL:

D.W.A.T. (in Mts) DRAFT (in mtrs) T.P.I. (in Mts) T.P.C. (in Mts)
SUMMER 26710 on 10.46  92/36
WINTER 25902 on 10.24
TROPICAL 27520 on 10.68
FW 26710 on 10.69

9. LIST DEADWEIGHT ON THE FOLLOWING DRAFTS

|       | SW    | BW    | FW    |
|-------|-------|-------|-------|
| 28.0  | 19600 | 19250 | 18900 |
| 28.5  | 20150 | 19800 | 19450 |
| 29.0  | 20750 | 20350 | 20000 |
| 29.5  | 21300 | 20900 | 20550 |
| 30.0  | 21850 | 21450 | 21100 |
| 30.5  | 22400 | 22000 | 21600 |
| 31.0  | 22950 | 22550 | 22150 |
| 31.5  | 23500 | 23100 | 22700 |
| 32.0  | 24050 | 23650 | 23200 |
| 32.5  | 24600 | 24200 | 23800 |

10. LOA (Length over All): as given

11. LBP (Length between Perpendiculars): 173.862

12. BREADTH MOULDED & DEPTH MOULDED: 22.895/14.402

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont/d...
13. GRT/NRT (INTERNATIONAL / SUEZ / PANAMA) AND LIGHTSHIP
    WEIGHT:
    16829/17449.8/17669.57
    9293/13909/13145

OWNERS CONFIRM VSL IS & WILL REMAIN FULLY FITTED FOR TRANSIT
OF SUEZ, PANAMA AND ST. LAWRENCE SEAWAY: yes

14.
A) CONSTANTS (EXCLUDING FRESH WATER): abt 350 excl fw
B) FRESH WATER CAPACITY: abt 320 mts
C) DAILY FRESH WATER CONSUMPTION: abt 10 mts
D) OWNERS CONFIRM THAT VSL HAS A FULLY OPERATIONAL
EVAPORATOR AND WILL REMAIN
SO THROUGH OUT THE DURATION OF THE C/P WITH PRODUCTIVITY
(MTS/DAILY):

15.
A) PERMANENT BUNKER CAPACITY BASIS 100 PCT: 1439 cbm ifo / 337 cbm
mgo
B) ACTUAL BUNKER CAPACITY 85 PER CENT
C) UNPUMPABLE BUNKER QUANTITY: N/A
D) CAPACITY OF BALLAST TANKS: 8045 MT
E) OWNERS CONFIRM VESSEL CAN BE TOTALY DEBALLASTED: yes
F) OWENRS CONFIRM VESSEL DOES NOT HAVE A BALLAST HOLD: yes
G) OWNERS CONFIRM THAT TANKS MARKED IFO AND MDO IN
CAPACITY PLAN ARE STILL ALL
USED FOR IFO/MDO RESPECTIVELY AND THAT NO ADDITIONAL TANK IS
BEING MODIFIED OR
USED FOR STORYING, MOVING OR TRANSPORTING BUNKERS DURING
OR AFTER BUNKERING
OPERATIONS: yes

16. DISTANCE KEEL TO HATCH COAMINGS: 16.5 mtrs

17. DISTANCE KEEL TO HIGHEST POINT: 41.950mts

18. AIR DRAFT IN BALLAST AND HEAVY BALLAST CONDITION: LIGHT
AND HEAVY BALLAST 12 M / 9.7 M

19. DISTANCE FROM WATER LINE TO HATCH COAMING: 12 ballast

20. DISTANCE FROM SHELL PLATING TO HATCH OPENING: abt 5 mtrs

21.
A) NUMBER OF HOLDS AND HATCHES: as given

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont'd...
B) HATCH DIMENSIONS: as given
Ho1:
Ho2:
Ho3:
Ho4:
Ho5:
Ho6:
Ho7:

C) HATCH COVER TYPE: as given

D) LOCATION / SIZE OF CARGO LOADING HOLES, WHICH ARE
CONFIRMED OPERATIONAL: n/a

E) DISTANCE FROM FRONT OF FORWARD HATCH COAMING TO AFT OF
LAST HATCH COAMING:
abt 120mtrs

F) TANKTOP STRENGTH: abt 15 mts/sqm

G) OWNERS CONFIRM VESSEL HAS TOPSIDE WINGTANKS ALL HOLDS:
yes

H) OWNERS CONFIRM ALL WING TANKS ARE BALLAST TANKS: yes

I) OWNERS CONFIRM NO CARGOBATTENS/SIDE SPARRINGS IN HOLDS:
yes

J) OWNERS CONFIRM TANKTOP IS STEEL, STRENGTHNED AND SUITABLE
FOR GRAB
DISCHARGE: yes

K) OWNERS GUARANTEE THAT VESSEL HAS SUFFICIENT STABILITY
AND SAFE TRIM WHEN
TRADING HOMOGENEOUSLY LOADED TO FULL CUBIC AND
DEADWEIGHT CAPACITY: yes

L) OWNERS CONFIRM HOLDS ARE HOPPERED: yes

M) OWNERS CONFIRM VSL HAS CLEAR UNOBSTRUCTED MAIN HOLDS:
yes

N) OWNERS CONFIRM THAT VSL HAS NO CENTERLINE BULKHEAD
AND/OR ANY OTHER
OBSTRUCTIONS AND/OR ANY HORIZONTAL FRAME AND/OR BEAMS: yes

O) OWNERS CONFIRM THAT VESSEL HAS NO DEEP TANKS OR
COMPARTMENTS THAT WERE
ORIGINALLY CONSTRUCTED AS DEEP TANKS: yes

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont/d...
P) OWNERS CONFIRM THAT VSL HAS NO REEFER SPACE OR SPECIAL
CARGO LOCKER SPACE:
yes

Q) MAXIMUM PERMISSABLE LOAD ON DECKS + HATCHCOVERS: n/a - NO
DECK CARGO ALLOWED

R) HOLD DIMENSIONS PER HOLD (L x B x H):
Ho1: 21.7x10.1/21.7x14.2
Ho2: 23.7x21.7x22.8x14.7
Ho3:20x22.8x14.7
Ho4:20x22.8x14.7
Ho5:23.2x22.8x14.7
Ho6: 20x22.8/19.8x14.7

T) TANK TOP FLAT FLOOR DIMENSIONS (EXCLUDING CORRUGATED
BULKHEAD) (L x B): as
above.
Ho1:
Ho2:
Ho3:
Ho4:
Ho5:
Ho6:
Ho7:

22. ADVISE IF VSL HAS STERN AND/OR BOW THRUSTER: no

23. OWNERS CONFIRM CO2 FITTED IN CARGO HOLDS: yes

24. OWNERS CONFIRM AUSTRALIAN HOLD LADDERS FITTED: yes

25. OWNERS TO ADVISE IF VSL HAS ELECTRICAL VENTILATION AND AIR
CHANGES PER HOUR: 3 airchanges per hour

26. GRAIN/BALE CAPACITIES HOLD BY HOLD (EXCLUDING BLEEDING
WINGTANKS) IN CUBIC
FEET: as given
GRAIN / BALE
Ho1:
Ho2:
Ho3:
Ho4:
Ho5:
Ho6:
Ho7:

TOTAL: /

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont'd...
27. TYPE OF GEAR, SWL, NUMBER, WHERE SITUATED, OUTREACH:
as given/ outreach abt 7 mtrs

28.
A) OWNERS CONFIRM VSL IS GRAB FITTED & CONFIRMED SUCH GRABS
ARE OPERATIONAL:
B) NUMBER OF GRABS ONBOARD: 3  6.3 cbm
C) TYPE AND MAKER:
D) CONFIRM GRABS ARE NOT TOUCH BOTTOM OPENING TYPE:
E) MAXIMUM CUBIC AND WEIGHT CAPACITY:
F) PIECE WEIGHT:
GRABS ARE NOT TO BE CONSIDERED FOR CHARTERERS USE UNDER
THIS CHARTER PARTY UNLESS PREVIOUSLY AGREED, AND IF SO ON
THE CONDITIONS SET, BY OWNERS.

29.
A) NATIONALITY OF CREW: philipino
B) MASTER'S NAME: virgilio garzon
C) CHIEF ENGINEERS NAME: reverting

D) OWNERS CONFIRM THAT MASTER/CH.ENG CAN SPEAK & WRITE
FLUENTLY THE ENGLISH
LANGUAGE: yes

30.
OWNERS CONFIRM THE VESSEL IS FULLY FITTED FOR

A) PANAMA / SUEZ: see above
B) ST. LAWRENCE SEAWAY / GREAT LAKES: see above
AND WILL REMAIN FITTED THROUGH-OUT THE DURATION OF THE C/P.

31.
A) OWNERS CONFIRM VESSEL FITTED FOR CARRIAGE OF GRAIN IN
ACCORDANCE WITH
CHAPTER VI FOR SOLAS 1974 AND AMMENDMENTS, WITHOUT
REQUIRING BAGGING AND/OR
STRAPPING AND/OR LASHING AND/OR SECURING WHEN LOADING A
FULL CARGO (DEADWEIGHT)
OR AGRIPRODS IN BULK (STOWAGE FACTOR 43-58 CBFT-100 % CUBIC
CAPACITY) WITH ENDS
UN-TRIMMED (yes/no): YES

B) OWNERS CONFIRM THAT CUBIC CAPCITY OF EACH HOLD IS BASED
ON UNTRIMMED ENDS
(yes/no): YES

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont/d...
C) OWNERS CONFIRM VESSSEL IS A SINGLE DECK SELFTRIMMING BC
AND WAS ORIGINALLY
BUILT AS A SD SELF TRIMMING BC: yes

D) OWNERS CONFIRM VESSEL CAN LIFT A FULL CARGO OF STEEL /
STEEL PRODUCTS UP TO
HER FULL DWAT CAPACITY according to tanktop strenght

E) OWNERS CONFIRM VESSEL IS STRENGTHENED FOR THE CARRIAGE
OF HEAVY CARGOES AND
SUITABLE FOR ALTERNATE HOLD LOADING (without requiring any bagging
and/or
strapping and/or lashing) AND STATE ALL COMBINATIONS OF HOLDS
WHICH MAY BE LEFT
EMPTY: no

F) OWNERS CONFIRM VESSEL IS FULLY LOGS/TIMBER FITTED
INCLUDING ALL LOOSE LASHING MATERIALS, CHAINS, STANCHIONS
FOR THE CARRIAGE OF A FULL LOAD OF LOGS/TIMBER ON AND UNDER
DECK. PLEASE ADVISE no

i) STANCHION TYPE AND HEIGHT
ii) DECK CUBIC CAPACITY

G) VSL HAS A VALID APPENDIX B CERTIFICATE (WHICH PLS COPY): as
given

32.
A) LAST DRYDOCK (WHEN+WHERE) NEXT DD EXPIRY DATE: LAST DD/SS
OCT 2006
B) HULL+MACHINERY VALUE: usd 5 million
C) OWNERS P+I CLUB: abs
D) LAST CLASS INSPECTION: OCT 2006

33.
A) SPEED CONSUMPTION STEAMING (LADEN/BALLAST): as given
B) PORT CONSUMPTION IDLE/WORKING: as given
C) ADVISE IF ECO SPEED (LADEN/BALLAST): as given
D) BUNKER GRADES as given

34.
A) FULL DETAILS/CONTACT NBRS OF:
- OWNING COMPANY rejoy shipping co ltd valletta malta
- MANAGERS pendulum shipmanagement INC kifisia 14564 athens
  TEL +30210 6254270, FAX + 30210 6254753
- DISPONENT OWNERS (AS APPLICABLE)
B) ADVISE IF VESSEL IS DISPONENTLY OWNED OR TIME CHARTERED: n/a
B) OWNERS BANKERS + ACCOUNT NO.: upon fixing

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont'd...
C) FULL STYLE AND CONTACT NBRS OF AGENTS AT LAST PORT PRIOR
TO DELIVERY: on /tc

35. SINCE WHEN IS VSL UNDER PRESENT OWNERSHIP OR MANAGEMENT
(STATE PREVIOUS
NAME OF OWNERS & MANAGERS): since 2001

36. OWNERS CONFIRM THAT VSL HAS NO HISTORY OF GROUNDINGS
AND/OR STRANDINGS
AND/OR COLLISSIONS AND/OR GENERAL AVERAGE, AND/OR
POLLUTION INCIDENT AND/OR
OTHER SERIOUS ACCIDENTS IN THE LAST 12 MONTHS, OTHERWISE PLS
ADVISE:

37. LAST (5) VOYAGES/CARGOES/CHARTERERS (COMMENCING WITH
THE MOST RECENT ONE):
bgd cement / mellscale/ ferts / wheat / minerals
countra/pilpex/cmc/medmar/ivs
38. OWNERS CONFIRM THAT VSL IS FULLY COVERED BY PANDI,
MEMBER OF THE
INTERNATIONAL GROUP OF PANDI CLUBS, AND WILL REMAIN SO
THROUGH OUT THE DURATION
OF THE TIME CHARTER.

39. PLS COPY WITH FOLLOWING CERTIFICATES WHICH ARE VALID
WHICH OWNERS CONFIRM
WILL REMAIN VALID DURING T/C PERIOD:

- SAFETY EQUIPMENT CERTIFICATE,
- SAFETY CONSTRUCTION CERTIFICATE,
- CLASSIFICATION CERTIFICATE,
- INTERNATIONAL LOADLINE CERTIFICATE,
- DERATING CERTIFICATE,
- OPA & COFR CERTIFICATE,
- SAFETY RADIO CERTIFICATE,
- SMC/DOC,
- PANDI CERTIFICATE,
- LOADLINE CERTIFICATE,
- PANAMA & SUEZ TONNAGE CERTIFICATE,
- ISPS CERTIFICATE,
- H&M INSURANCE LETTER CONFIRMATION,
- REGISTRY CERTIFICATE,
- IOPP CERTIFICATE

40. OWNERS CONFIRM LAST SS OR INTERMEDIATE SURVEY DATES AND
THAT VESSEL HAS NO
OUTSTANDING CONDITIONS OF CLASS: yes

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 69. Cont'd...
41. OWNERS CONFIRM THAT DURING VSL'S CALL AT PORT (S) IN THE
U.S.A. (OVER THE
LAST 12 MONTHS) NO DEFICIENCIES AND/OR NON-CONFORMITIES WERE
FOUND BY LOCAL
AUTHORITIES AND/OR COAST GUARD, OTHERWISE PLS ADVISE WHEN,
WHERE AND NATURE OF
SUCH DEFICIENCIES AND/OR NON-CONFORMITIES: yes

42. OWNERS CONFIRM THAT DURING VSL'S CALL AT PORT (S) IN
AUSTRALIA (OVER THE
LAST 12 MONTHS) NO DEFICIENCIES AND/OR NON-CONFORMITIES WERE
FOUND BY LOCAL
AUTHORITIES AND/OR COAST GUARD, OTHERWISE PLS ADVISE WHEN,
WHERE AND NATURE OF
SUCH DEFICIENCIES AND/OR NON-CONFORMITIES: yes

43. OWNERS CONFIRM THAT VSL HAS NOT BEEN DETAINED OR FOUND
WITH DEFICIENCIES BY
COAST GUARD OR OTHER PORT AUTHORITY IN REF TO SAFETY AND/OR
ENVIROMENTAL ISSUES
OVER THE LAST 12 MONTHS, OTHERWISE PLS ADVISE WHEN, WHERE
AND NATURE OF SUCH
DEFICIENCIES AND/OR NON-CONFORMITIES: yes

44. OWNERS CONFIRM VESSEL IS NOT BLACK LISTED BY ANY PORT
AUTHORITY, COUNTRY OR
ORGANISATION: yes

45. OWNERS CONFIRM THAT VSL HAS NOT BEEN LAID UP DURING THE
LAST 12 MONTHS: yes

46. PLS ADVISE IF VSL HAS BEEN APPROVED BY "RIGHTSHIPS" AND IF
YES PLS ADVISE
RATING VSL ACHIEVED: n/a

all details abt

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15ᵀᴴ JANUARY 2007

Clause 70

Charterers to be responsible for stevedore damage provided any such damage incurred
during this Charter is reported by the Master to the Charterers and their agents in
writing within 24 hours of occurrence and latest when the damage could have been
discovered by the exercise of due diligence, but no later than 24 hours after
completion of discharge of loading always prior to redelivery.

The Master to use his best efforts to obtain written acknowledgement by responsible
parties causing damage, unless damage has been made good in the meantime.
Stevedore damage affecting vessels seaworthiness the cargo worthiness shall be
repaired at Charterers' time and expense prior to redelivery. Any and all Stevedore
damage not described above shall be repaired at the Charterers option, before or after
redelivery concurrently with the Owners work. In such case no hire and/or expenses
will be paid to the Owners except and insofar as the time and/or the expenses required
for the repairs for which the Charterers are responsible, exceed the time and/or
expenses necessary to carry out the Owners work.

Clause 71 – BIMCO ISM Clause

From the date of coming into force of the International Safety Management (ISM)
code in relation to the vessel and thereafter during the currency of this Charter Party.
The Owner's shall procure that both the vessel and "The Company" (as defined by the
ISM code) shall comply with the requirements of the ISM code. Upon request the
Owner's shall provide a copy of the relevant document of compliance (DOC) and
Safety Management Certificate (SMC) to the Charterers, except as otherwise provided
in this Charter Party, loss, damage, expense and or delay caused by the failure on the
part of the Owner's or "The Company" to comply with the ISM code shall be for
Owner's account.

Clause 72

With reference to Clause 5 of the Charter Party, payment of Charter Hire to be made
by telegraphic transfer to:
EFG Eurobank
Bankers Trust New York, USA – Swift: BKTRUS33
For transfer under cable advise:
EFG EUROBANK ERGASIAS SA
SWIFT: EFGBGRAA – Shipping Branch – 75 A. Miaouli Str-Greece
USD A/C: 0026 0029 25 1200234135
IBAN GR7502600290000251200234135
BENEF: REJOY SHIPPING CO LTD

Clause 73

In the event of a breakdown of cranes for any period by reason of disablement or
insufficient power the hire to be reduced pro rata for the period of such inefficiency in
relation to the number of hatches affected. If Charterers continue working by using
shore cranes Owners are to hire and pay such expenses but then the vessel not to be
placed off-hire. If crane breakdown is the result of Charterers
agents/employees/servants actions/ommitions/negligence then all expenses, time lost
and cost to be for Charterers.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 74 -- Water Pollution
Vessel shall comply with any local, national and international regulations regarding
water pollution. If pollution occurs then time so lost and any/all expenses incurred to
be for Owners account and responsibility.

Clause 75.
Charterers undertake to keep Owners informed during the period as regards the
itinerary of the vessel and names of their agents at ports of call.

Clause 76.
For the purpose of hire calculation GMT to apply both ends.

Clause 77.
For any disputes under US$100,000, Arbitration to be conducted under London
Maritime Arbitrators Association small claims procedure.

Clause 78
Owners warrant that the vessel will not change name/flag/class/ownership/P+I Club
without Charterers prior consent. Owners confirm that vessel will not be sold for
scrap on completion of this voyage.

Clause 79
Charterers to have the benefit of Owner's P and I Club association as far as rules
permit.

Clause 80
With reference to Clause 18, Charterers undertake that they will not procure, nor
permit to be procured, for the vessel any supplies, necessities or services (including
but not limited to port services / utilities, bunkers, agency attendance etc.) on the
credit of the Owners and/or vessel and/or Managers. Owners/Master have the right to
issue notices/disclaimers to the suppliers/furnishers as they deem fit at any time to
make them aware that the supplies, necessities, services are rendered to the vessel
solely on behalf of the Charterers, after having surrendered their rights to claim
maritime lien on the vessel.

Clause 81
Neither the Charterers nor their Agents shall permit the issue of any bill of lading,
waybill or other document evidencing a contract of carriage (whether or not signed on
behalf of the Owners or on the Charterers' behalf or on behalf of any Sub-Charterers)
incorporating, where not compulsorily applicable, the Hamburg Rules or any other
legislation imposing liabilities in excess of Hague or Hague/Visby Rules, the
Charterers shall indemnify the Owners against any liability, loss or damage which
may result from any breach of the foregoing provisions of this clause.

Clause 82
Vessel to be in possession of a valid International Cargo Gear Certificate which to be
shown to Charterers or their Agents if so required by them. Any delay therefrom shall
be for Owners' account and Owners to pay all extra expenses incurred resulting from
such failure and hire shall cease until vessel is in a position to comply with the above
mentioned requirement.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 83
For whatever reason if vessel remains off-hire for more than 25 continuous days under this Charter Party, Charterers have the right to cancel this Charter Party and redeliver the vessel provided vessel free of cargo.

Clause 84
Charterers have the option to fumigate the cargo at loading and discharging ports during/after loading respectively before/during discharge and/or en route at their time and expense. If crew required to stay ashore by port authorities lodging expenses to be for Charterers' account. Fumigation as per IMO and local regulations.

Clause 85
Separations between cargoes, other than natural, to be for Charterers account/risk and expense. Charterers confirm that cargo is one grade and for one discharge port. If more than one cargo receiver, Owners not to be responsible for the proper cargo splits between the Receivers, but, to be responsible for the total cargo discharged. The Master to tender best assistance during draft surveys.

Clause 86
Safe Stowage and Trimming –
Charterers are to leave the vessel is safe and seaworthy trim and with cargo on board safely stowed, to the Master's class satisfaction for all shiftings and all passages between ports under this Charter and in their time and at their expense.

Clause 87 – Taxes
Charterers to pay all local, national taxes and/or dues assessed on the vessel or the Owners resulting from the charterers orders herein, whether assessed during or after the currency of this Charter Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding taxes levied by the country of the flag of the vessel or the Owners), extra insurance on cargo due to ship age; if any, to be for Charterers account.

Clause 88 – War Risk Clause
Any extra and/or additional war risk premium over and above basic war risk premium charged by Owners underwriters by reason of vessel trading under this c/p to be for charterers account and to be refunded to Owners by Charterers upon receipt of copies of Owners underwriters/brokers net invoices. Such additional and/or extra Insurance not to exceed that obtainable from first class insurers at Lloyds of London on same terms and conditions as Owners cover. Extra crew war bonus, if and when applicable, to be for Charterers account and is payable against original and duly documented payment advices/receipts of crew.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 89 – Trading Exclusions
Israel, Lebanon, Australia, New Zealand, Turkish Occupied Cyprus, Sweden, Finland,
Denmark, Norway, Liberia, Sudan, Sri Lanka, Sea of Azov, Cambodia, Democratic
Republic of Congo (formerly Zaire), Eritrea, Ethiopia, Lebanon, Russian Pacific
ports, Slovenia, Federal Republic of Yugoslavia (Serbia & Montenegro), North
Korea, Somalia, North and South Yemen and all war areas either presently in force or
in future imposed.
Conwartime clause and Gencon Ice clause to apply

Cuba allowed but not for the last 180 days prior to redelivery unless licensed us cargo.

Nigeria and Syria permitted provided that any bagged cargo claims of whatsoever
nature to be for Charterers account and to be dealt and defended by Charterers/their
P and I club without the involvement of owners. Any loss of time/detention/security
required to be entirely Charterers account and responsibility.

Clause 90 – ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005
(a)(i) The Owners shall comply with the requirements of the International Code for
the Security of Ships and of Port Facilities and the relevant amendments to Chapter
XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by
the ISPS Code). If trading to or from the United States or passing through United
States waters, the Owners shall also comply with the requirements of the US Maritime
Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as
defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant
International Ship Security Certificate (or the Interim International Ship Security
Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages,
expense or delay) caused by failure on the part of the Owners or "the
Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this
Clause shall be for the Owners' account, except as otherwise provided in this Charter
Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style
contact details and, upon request, any other information the Owners require to comply
with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this
Charter Party, the Charterers shall ensure that the contact details of all sub-charterers
are likewise provided to the Owners and the Master. Furthermore, the Charterers shall
ensure that all sub-charter parties they enter into during the period of this Charter
Party contain the following provision:

> "The Charterers shall provide the Owners with their full style contact details
> and, where sub-letting is permitted under the terms of the charter party, shall
> ensure that the contact details of all sub-charterers are likewise provided to
> the Owners".

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15ᵀᴴ JANUARY 2007

Clause 90. Cont'd...
(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Clause 91 - U.S. Customs Advance Notification/AMS Clause for Time Charter Parties
(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 92 - Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

  (i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex
      VI and with the requirements of any emission control zone; and
  (ii) the Vessel shall be able to consume fuels of the required sulphur content
      when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

Clause 93 - Bunker Quality Control Clause for Time Chartering
(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Clause 93. Cont/d...

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by (...) or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any PROVEN damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

## NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following Clause shall apply;

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the of Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contract.

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charge incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the carrier before delivery.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

## CONWARTIME 2004

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the Shipowners, bareboat Charterers, Disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:
War; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

Cont'd...

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty: -

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

ADDITIONAL CLAUSES TO M/V "SPRING BREEZE I"
C/P DATED 15TH JANUARY 2007

## GENERAL PARAMOUNT CLAUSE

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporate the rules relating to Bills of lading contained in the International Convention, dated Brussels 25th August 1924, and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any terms of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.